JOHN W. HUBER, United States Attorney (#7226)
JARED C. BENNETT, Assistant United States Attorney (#9097)
Attorneys for the United States of America
185 South State Street, Suite 300
Salt Lake City, Utah 84111
Telephone: (801) 524-5682

FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

SEP 1 8 2017

BY D. MARK JONES, CLERK
_____
DEPUTY CLERK

ELINOR COLBOURN, Senior Counsel for Wildlife Programs
Environmental Crimes Section
Environment and Natural Resources Division
U.S. Department of Justice
601 D. St. NW, Suite 2300
Washington, DC 20004
Telephone: (202) 305-0205

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:17CR541DBP |
| Plaintiff, | STATEMENT BY DEFENDANT IN ADVANCE OF PLEA OF GUILTY AND PLEA AGREEMENT |
| vs. | |
| Young Living Essential Oils, L.C., | Judge Dustin B. Pead |
| Defendant. | |

I, as the duly authorized representative of Young Living Essential Oils, L.C. ("Company"), hereby acknowledge and certify that I have been advised of and that I understand the following facts and rights as they pertain to the Company, and that I have had the assistance of counsel in reviewing, explaining, and entering into this agreement on the Company's behalf. For purposes of this agreement, the use of the pronouns "I" or "me" herein refers to me acting on the Company's behalf unless otherwise specified.

    1.    As part of this agreement with the Environmental Crimes Section, Environment and Natural Resources Division of the U.S. Department of Justice and the U.S. Attorney's Office for the District of Utah (collectively "Government Parties" or "Government"), the Company intends to plead guilty to Counts I and II of the misdemeanor Information. The Company's in-house and outside attorneys have explained the nature of the charges against the Company, and I have had an opportunity

to discuss the nature of the charges, the facts underlying this agreement, and all other aspects of the plea process, with the Company's attorneys. The Company and I are fully satisfied with the Company's in-house and outside attorneys. I understand the charges against the Company and what the Government is required to prove in order to convict the Company. The elements of Count I, Engaging in Trade Contrary to the Convention on International Trade in Endangered Species (CITES) (16 U.S.C. §§ 1538(c)(1) and (g), 1540(b)(1)), are:

  A. The Company, acting through several employees and agents;

  B. Knowingly engaged in trade, and caused or solicited another to do so, in a plant specimen, specifically spikenard (*Nardostachys grandiflora*); and

  C. That trade was contrary to the provisions of the Convention on International Trade in Endangered Species (CITES), specifically without the required CITES re-export certificate.

The elements of Count II, Misdemeanor Trafficking in Illegally Harvested and Transported Plants (16 U.S.C. §§ 3372(a)(2)(B), (a)(4) and 3373(d)(2)) are:

  A. The Company, acting through several employees and agents;

  B. Knowingly acquired, purchased, imported, transported, received and sold, and attempted to acquire, purchase, import, transport, receive and sell, plants, specifically rosewood (*Aniba rosaeodora*) in interstate and foreign commerce; and

  C. In the exercise of due care, the Company should have known the plants were taken and transported in violation of and in a manner unlawful under foreign law; and

  D. The plants were in fact taken and transported in violation of and in a manner unlawful under foreign law, specifically laws and regulations of Peru that protect plants, that regulate the taking of plants without, or contrary to, required authorization, and that govern the export or transshipment of plants.

  2. The Company recognizes that the maximum possible penalty provided by law for each of Counts I-II of the Information is a term of probation of five years, a fine of $200,000 or twice the gross gain or loss derived from the offense, and any applicable forfeiture. *See* 18 U.S.C. § 3571(d). The Company understands that if the Company violates a term or condition of probation, it can be resentenced according to 18 U.S.C. § 3565(a). Additionally, the Company understands that the Court is required to impose a

special assessment in the amount of $125 for each offense of conviction, pursuant to 18 U.S.C. § 3013(a)(1)(B)(iii).

3. The Company recognizes that the sentencing procedures in this case, and the ultimate sentence, will be determined pursuant to 18 U.S.C. § 3553(a), and that the Court must consider, but is not bound by, the United States Sentencing Guidelines in determining the Company's sentence. The Company has discussed these procedures with the Company's in-house and outside counsel. The parties agree that the provisions of Chapter 8 of the Guidelines Manual, which pertain to fines imposed on corporate defendants, such as the Company, do not apply to environmental offenses such as those charged. *See* USSG §§ 8C2.1 and 8C2.10. The parties agree that the remaining provisions of Chapter 8 of the Guidelines Manual, including community service and probation, apply to the Company. *See* USSG § 8B1.3; *see also* 18 U.S.C. § 3563(b)(12) (community service as part of a criminal sentence). The Company also knows that the final calculation of the Company's sentence by the Court may differ from any calculation the Government Parties, the Company's attorneys, or the Company has made. However, because this plea of guilty is being entered pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), as explained below, the Company will be able to withdraw its plea if the Court does not accept the terms of this agreement. Pursuant to Rule 11(c)(1)(C), the Court can elect to accept the stipulated sentence as a whole or reject the proposed sentence as a whole, but the Court cannot modify the proposed sentence's terms without the mutual consent of the parties. If the Court rejects this agreement, it is further agreed that each party would be permitted to withdraw from the agreement.

4. The Company recognizes that the Company has a right to plead "not guilty" and proceed to trial on the charges against the Company.

5. The Company recognizes that the Company has a right to a trial by jury, and I know that if the Company stands trial by a jury:

    a. It has a right to the assistance of counsel at every stage of the proceeding.

    b. It has a right to see and observe the witnesses who testify against it.

    c. Its attorney can cross-examine all witnesses who testify against it.

    d. It can call witnesses to testify at trial, and it can obtain subpoenas to require the attendance and testimony of those witnesses.

    e. If the Company chooses not to mount a defense, the jury will be told that no inference adverse to the Company may be drawn therefrom.

    f. The Government must prove each and every element of the offense charged against the Company beyond a reasonable doubt.

g. It requires a unanimous verdict of a jury to convict the Company.

h. If the Company were to be convicted, it could appeal.

6. If the Company pleads guilty, the Company will not have a trial of any kind.

7. The Company recognizes that 18 U.S.C. § 3742(c)(1) sets forth the circumstances under which the Company may appeal its sentence. However, fully understanding the Company's right to appeal its sentence, and in consideration of the concessions and/or commitments made by the Government Parties in this agreement, I knowingly, voluntarily and expressly waive the Company's right to appeal as set forth in paragraph 11(f) below.

8. The Company recognizes that, under 18 U.S.C. § 3742(c)(2), the Government Parties may only appeal the Company's sentence if it is less than the sentence set forth in this agreement.

9. The Company recognizes that under a plea of guilty the judge may ask me questions under oath about the charged offenses. The questions, if asked on the record, must be answered truthfully and, if I give false answers, I, personally, can be prosecuted for perjury.

10. The Company stipulates and agrees that the Company is pleading guilty without reservation because it is in fact guilty of the charged offenses. The following facts accurately describe the Company's conduct. These facts provide a basis for the Court to accept the Company's guilty plea, and do not represent the entirety of the Government's evidence against the Company. These facts constitute a stipulation of facts for purposes of section 1B1.2(a) of the Sentencing Guidelines:

a. The Company is a limited company organized in Utah and based in Lehi, Utah. It produces and sells essential oils, that is, concentrated liquids distilled from plants. Such oils and blends of oils are used in cosmetics, soaps, toothpaste, and household cleaning products among others.

b. Though the Company has remained a closely held family business, the Company employs approximately 2,800 people and maintains offices in Australia, Europe, Canada, Ecuador, Mexico, Taiwan, Malaysia, Hong Kong, Japan, Indonesia, Croatia, the United States, and Singapore. In recent years the Company has grown rapidly and now supplies products to approximately 2 million active distributors annually who both use the products themselves and resell them through a direct sales business model. In 2015 the Company's global revenues exceeded $1 billion.

c. One of the oils produced and sold by the Company was rosewood oil. Rosewood oil is distilled from the tree species *Aniba rosaeodora* (rosewood). Rosewood oil

4

accounted for a small percentage (~.13% by volume) of the Company's raw oil use. During the time period covered in this Information, the fair market retail price of rosewood oil was over $3,000 per liter.

d. The Company also produced and sold spikenard oil. Spikenard oil is distilled from the plant species *Nardostachys grandiflora*. During the time period covered in this Information, the fair market retail price of spikenard oil ranged from approximately $2,000 to $10,000 per liter.

e. The United States, along with 182 other countries, is a party to CITES. CITES is a multilateral treaty aimed at preventing the extinction of species of wild animals and plants by regulating the international trade in species at risk due to trade. At-risk species are listed in one of three appendices. Both rosewood and spikenard are listed in Appendix II. This means that while each species is not currently threatened with extinction, it could become so if trade in the species is not regulated.

f. Under CITES, as implemented in the United States through the Endangered Species Act, to import Appendix II species into the United States the importer must submit an export permit issued by the country of origin of the specimens. Such permits are issued only after the relevant government makes a finding that the specimens were legally acquired and that the export will not be detrimental to the survival of the species. Such requirements help to ensure that, among other things, commercially valuable species such as rosewood and spikenard continue to be available long term for commercial use.

g. Spikenard was added to Appendix II in 1997. It is a plant native to the Himalayan region. Its population in Nepal is estimated to have declined over 30% in ten years due to over harvesting.

h. Rosewood was added to Appendix II by the parties to CITES in June 2010. It is a large tree native to the tropical rainforests of Brazil, Colombia, Ecuador, French Guiana, Guyana, Peru, Suriname and Venezuela.

i. Around the time rosewood was listed, the Company became concerned about a possible shortage of rosewood oil for its products and started an effort to source rosewood outside of Brazil, specifically in Peru.

j. A substantial amount of illegal logging occurs in Peru, driven by market demand, including demand from companies in the United States. The widespread illegal logging trade in Peru has been tied to an increase in that country's corruption, exploitation and, in some instances, deadly violence. There is no evidence that this case involved any such violence.

5

k.  The Company opened an office and distribution center in Lima, Peru, in approximately 2011. The Company's Peru business served primarily as a distribution center to supply Peruvian distributors. The revenue for the Company's Peru operation in 2014 was a minor percentage of the Company's global revenue that year.

l.  From June 2010 to at least October 2014, several Company employees and contractors harvested, transported, and distilled rosewood in Peru, and imported some of the resulting oil into the United States. Peruvian law prohibits the unauthorized harvest and transport of timber, including rosewood. Neither the Company nor its suppliers, employees, or agents had any valid authorizations from the Peruvian government. Peru also prohibits the export of CITES-protected species without the required permits. The Company did not obtain any CITES export permits from Peru.

m.  Specifically, in the fall of 2010, a few Company employees imported into the United States via its farm in Ecuador several canisters of rosewood oil derived from illegally-harvested and illegally-transported Peruvian rosewood. The oil was knowingly falsely labeled as "rose geranium" and was imported into the United States without the required permits.

n.  In February 2011, the Company asked an employee to travel to Peru to harvest more rosewood. The employee refused, stating it was too dangerous to be transporting what he believed to be illegal goods.

o.  On February 10, 2011, the Company received 14.8 kilograms of "rosewood, aniba rosaeodora" from its farm in Ecuador, without any CITES export permit.

p.  In the summer of 2011, a few Company employees arranged for the harvest, transport, and purchase of at least three tons of additional rosewood in Peru without any government authorizations. Again the wood was distilled and resulting canisters of oil falsely labeled as "rose geranium" were transported to the United States by a few Company employees.

q.  On August 5, 2011, the Company received 20.6 kilograms of "rosewood Ecuador" from its farm in Ecuador, without any CITES export permit.

r.  In the fall of 2011, a Company employee in Peru advised in writing that "in a short time they [rosewood trees] will disappear by illegal logging," but nevertheless recommended securing wood for 2-3 years of oil production until cultivated trees could be used. The employee suggested that the rosewood oil could be exported to the United States in two ways: (1) by saying it is "Geranium Rosa to avoid problems"; or (2) by "saying it is extracted from the estate of Young Living in the jungle of Peru."

6

s.  A few Company employees continued to harvest rosewood in Peru in 2011 without authorization. Company employees discussed payments and expenses related to the harvesting, including "cop's pay-offs."

t.  Throughout 2012, the Company made efforts to obtain a CITES export permit for the rosewood it was illegally harvesting. The Company also started to explore buying land and developing a farm for the purpose of cultivating rosewood. In September 2012, a Company employee in Peru wrote to a Company manager in the United States that "we can cut rosewood, but that is not legal, however we can say that was [sic] cut on our land and thus distill what we need (remember that our permit allows us to distill the rosewood and the government signed documents indicating the existence of this species in our area, even if this is not real will enable us to meet our goal of essential oil of rosewood in legal form)."

u.  In 2013 the Company continued to obtain rosewood and continued its efforts to develop a farm in Peru, in part for the purpose of obtaining permits to legitimize its unlawfully procured rosewood. The Company never acquired the land to develop the farm nor was the land ever cultivated for rosewood by or for the Company.

v.  By November 2013, the Company had accumulated approximately 83 tons of illegally-harvested and illegally-transported rosewood in Peru, intended for distillation and export to the United States.

w.  In spring 2014, the Company experienced a shortage of rosewood oil in the United States for its products. In July 2014 a Company executive wrote "flying my own plane down and can take the oil back with me in 2 weeks know [sic] one will know." However, the executive did not ultimately make that flight.

x.  In July 2014, a Company executive drafted a memo entitled "Project oiling the jungle" that discussed plans for the unlawful harvest, transport, and shipment of rosewood in Peru. This plan entailed taking rosewood stumps from the jungle to the Company farm to make it appear that harvested rosewood had originated from the farm. As set forth above, the Company never acquired the farm.

y.  On September 10, 2014, Young Living Farm Essential Botanical Farms, L.C. in Mona, Utah ("Botanical Farms"), a corporate entity related to the Company, invoiced the Company for $2,977.45 of "ROSEWOOD, ANIBA ROSAEODORA."

z.  On October 23, 2014, Botanical Farms invoiced the Company for $25,776.22 of "ROSEWOOD, ANIBA ROSAEODORA." Rosewood does not grow in commercial quantities in the United States.

aa. During the relevant time period the Company experienced extraordinary growth. As a consequence a number of new executives were employed. In October 2014, these executives became suspicious about the Company's activities in Ecuador and Peru involving rosewood, and dispatched Company counsel to Peru to begin to investigate the Company's activities there.

bb. On November 14, 2014, a Company employee in the United States received an email about the "Peru Project," stating that a boat was on its way to Iquitos from Pucallpa, Peru, carrying thirty tons of logs arranged to cover up five tons of roots.

cc. By this time, certain Company employees believed that pay offs had been or were being made to Peruvian government personnel.

dd. Between 2010 and fall 2014, a few Company employees harvested, transported, and possessed a total of approximately 86 tons of rosewood, all of which was harvested in violation of Peruvian law. All was intended for distillation and export to the United States; some was distilled and brought illegally into the United States.

ee. During the relevant time period, the Company lacked formal procedures, training, and a means of allowing elevation of problems for review and resolution. Lacking an internal compliance program, the new Company executives could not timely identify and stop potential violations.

ff. After the Company counsel's trip to Peru in October 2014, the Company engaged outside counsel to conduct an internal investigation, took immediate steps to ensure that the conduct in question in Peru and Ecuador had stopped, and quarantined protected plant products in question. On July 20, 2015, once the internal investigation was substantially complete, the Company made an initial written voluntary disclosure to the Government Parties of various facts indicating potential violations of United States and foreign law.

gg. On January 6, 2016, the Company supplemented its voluntary disclosure with additional facts and business records.

hh. The Company has continued to cooperate with the Government's investigation.

ii. Since before its initial notification in July 2015, the Company has been developing and implementing compliance policies, procedures, and employee training related to the Foreign Corrupt Practices Act and the Lacey Act. Specifically, the Company developed, submitted for review by the Government Parties as part of its voluntary disclosure process, and by first quarter of 2017 began implementing a rigorous draft Lacey Act Compliance Plan. It continues to conduct training for relevant Company employees and it completed an initial review of all of its materials and

suppliers. As a result of this work the Company has made changes in its sourcing and business methods.

jj. The Government's investigation revealed that, in addition to the conduct disclosed by the Company, in December 2015 the Company exported to the United Kingdom, without a CITES permit, spikenard oil that was harvested in Nepal. The spikenard oil had been previously imported from a company in the United Kingdom that had obtained a CITES export permit for the shipment. The Company found the product to be unsatisfactory and shipped it back to the United Kingdom. On March 23, 2016, a Company employee filed an application for a CITES permit for this shipment after the fact and without providing the required copy of the permit authorizing its original export from the United Kingdom.

kk. The Government's investigation also revealed that between November 2014 and January 2016, the Company purchased from a supplier/importer in the United States over 1,100 kilograms of "bois de rose natural" which the Government alleges occurred without exercising due care to verify lawful sourcing of that product.

ll. The Government calculates the fair market retail value of the plant products involved in the violations and relevant conduct (including but not limited to product equaling approximately 1,899.75 liters of rosewood oil) to be more than $3.5 million but not more than $9 million.

11.     The only terms and conditions pertaining to this plea agreement between the Company and the Government Parties are as follows:

a.   **Guilty Plea.**  The Company will plead guilty to Counts I and II of the misdemeanor Information.

b.   **Relevant Conduct.**  The Company understands and agrees that the Presentence Report, if any, may include descriptions of conduct the Company engaged in, which was not charged against it. The Company understands and agrees that the Court may take these facts into consideration in determining the reasonableness of the stipulated sentence.

c.   **The Sentence.**  Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the parties agree that the appropriate disposition of the case is as follows:

i.  Criminal Fine.  The parties stipulate and agree to a total fine amount of $500,000. The parties agree that the $500,000 fine imposed is appropriately directed to the Lacey Act Reward Account. *See* 16 U.S.C. §§ 1540(d), 3375(d).

ii. <u>Probation and Conditions</u>. The parties stipulate and agree that the Company shall be sentenced to a term of sixty months' probation with the following specific conditions imposed:

(1) The Company will implement a Lacey Act Compliance Plan ("Compliance Plan"), attached as Exhibit 1, and incorporated herein. The Compliance Plan addresses compliance with the Lacey Act, Endangered Species Act, and other federal laws regulating the importation and trade in plants and plant products, and includes a schedule for its implementation ("Compliance Schedule"). The goal of the Compliance Plan is to improve processes that enable the Company to avoid trading in illegally-sourced plants and plant products. The Compliance Plan and Compliance Schedule may be modified during the period of probation only with the written consent of the Government Parties. It will be implemented through specific procedures and guidance that will be refined over time and which the Company will continue to make available to the Government Parties during the period of probation.

(2) The Company will develop and implement compliance plans for the Foreign Corrupt Practices Act and relevant customs laws within the first year of probation.

(3) The Company will engage an outside accounting and/or environmental consulting firm or firms to conduct three audits - two of the Company's efforts and resources to implement the Compliance Plan, and one of its compliance with the Lacey Act through that implementation. The auditors shall, after each audit, generate a written draft report for review by the Company for accuracy and completeness, a copy of which will be simultaneously provided to the Government Parties; based on the Company's comments, the auditors shall issue a final written report of their findings and recommendations, which shall be submitted to the Government Parties and the Probation Office. The first audit shall address implementation of the Compliance Plan as to high-risk and medium-risk items and must be submitted in final within twelve months of sentencing. The report must include information on the risk assessments and sourcing decisions for all self-identified high and medium-risk items. The second audit shall address full implementation of the Compliance Plan and must be submitted in final within

10

eighteen months of sentencing. That report must include information on the risk assessments and sourcing decisions for all low-risk items. The third audit will examine substantive compliance with the Lacey Act as achieved by implementation of the Compliance Plan and must be submitted in final within thirty months of sentencing. The Government Parties will not disclose the contents of the reports except to the court or in court filings.

(4) If, within three months of submission of any audit report, the Government Parties determine that the Company has failed to implement the Compliance Plan according to the Compliance Schedule, and/or that the Company has failed to exercise due care and/or an item purchased or imported by the Company was more likely than not to have been illegally taken, possessed, transported or sold, it shall so notify in writing the Company's chief compliance officer and any outside counsel for the Company. If the notification relates to a failure to implement the Plan and Schedule, the Company and the Government Parties will attempt to resolve the issues identified; any resolution will be reduced to writing. If no written resolution is achieved within six weeks of the receipt of the notification, the Government's recourse will be under 18 U.S.C. § 3565 and Federal Rules of Criminal Procedure 32.1. If the notification relates to an alleged failure by the Company to exercise due care or probable cause that an item is subject to forfeiture, the Company shall, upon receipt of the notification, issue no new purchase orders for, and will quarantine, any items identified in the notification. Unless the Government rescinds the notification in writing, the Company and the Government Parties will attempt to resolve the issues identified; any resolution will be reduced to writing. If no written resolution is achieved within two months of the receipt of the notification, the Company may elect to either destroy the plants or plant products in question and cease acquisition of additional plants or plant products from the same supplier, or provide two weeks' notice to the Government Parties of its intent to resume trade in the plants or plant products at issue. The Government Parties would then have recourse under 18 U.S.C. § 3565 and Federal Rules of Criminal Procedure 32.1.

(5) The Company will, within the first six months of probation, place prominent statements in the following publications:

- *Essential Edge* (monthly)

- *Enews* (bimonthly)

- *Leader Bulletin* (monthly)

- *2017 Product Guide* (annual)

In addition, the Company shall place a similar statement in one general distribution or industry-wide publication mutually agreed upon by the parties and approved by the Probation Office. The statements must be approved by the Government Parties in advance and must accurately address the events leading to this plea agreement, the terms thereof, and the requirements and purposes of CITES and the Lacey Act.

However, the Company may elect, in lieu of the statements in the 2017 Product Guide and *Enews*, to provide (or have its representatives provide at the Company's expense) Lacey Act compliance training to at least two national and widely attended essential oil trade association conferences or seminars. The handouts used in the training must be approved by the Government Parties in advance. The handouts will include a statement that accurately addresses the events leading to this plea agreement and the terms thereof.

(6) The Company shall, at the time of sentencing, provide to the Government Parties an inventory of any rosewood, rosewood oil, spikenard, and spikenard oil, owned by the Company and possessed by it within the United States as of September 1, 2016. The Government Parties or their agent may inspect this product to verify its continued maintenance upon twenty-four hours' notice. The Company will, at its own expense, destroy any such rosewood, rosewood oil, spikenard, and spikenard oil owned by the Company and possessed by it within the United States as of September 1, 2016, for which legal sourcing and acquisition cannot be established by the Company to the satisfaction of the Government Parties. However, the Company agrees that the Government Parties may take and retain samples of the materials otherwise to be

destroyed, for scientific and educational purposes. The Company will maintain these products, at the Company's expense, until such time as the Government Parties confirm that they are no longer considered evidence and authorizes the required destruction. The disposition of the plants or plant products by destruction and/or sampling as specified above may be modified only by written agreement of all Parties and the Probation Office.

(7) At the time of sentencing, the Company shall make a payment of $125,000 to the National Fish and Wildlife Foundation ("NFWF"). NFWF is a congressionally-chartered nonprofit organization, established by 16 U.S.C. §§ 3701-3710, for the purpose of furthering the conservation and management of fish, wildlife, plants, and other natural resources. The payment shall be sent to the following address: National Fish and Wildlife Foundation, Attn: Chief Financial officer, 1133 15th Street NW, Suite 1100, Washington, DC 20005, with the case number specified in the note field of the check. NFWF shall exclusively utilize the payment to fund projects related to the conservation of rosewood, spikenard, galbanum, and/or other CITES-listed species of plants used in essential oils. Because the payment is designated as a criminal case resolution payment by an organization, the Company agrees that neither it nor any related entity will seek any reduction in its tax obligations as a result of the payment. In addition, since these payments constitute community service as part of the Company's guilty plea, neither the Company nor any related entity or agent will characterize, publicize or refer to the payment as a voluntary donation or charitable donation.

(8) The Company, during the period of probation, will continue to cooperate with the Government Parties. The Company's cooperation will include, but is not limited to, timely producing documents and samples of plants and plant products requested by the Government Parties, maintaining evidence, providing a custodian of record if requested by the Government Parties to authenticate documents at any appropriate legal proceeding, providing a corporate representative if requested by the Government Parties to describe corporate policies and use of produced documents, and facilitating interviews with any consenting employees.

      iii.  <u>Restitution</u>. The Company shall make restitution to the government of Peru in the amount of $135,000.

      iv.  The Company shall pay all the fine and payment immediately after sentencing. The Company shall pay the restitution within one month following sentencing.

d.  <u>The Company</u>

    e.  **No Further Prosecution**: This plea agreement is only binding on the United States Attorney's Office for the District of Utah and the Environmental Crimes Section, Environment and Natural Resources Division, United States Department of Justice. This plea agreement does not bind any other federal, state, or local prosecuting authority, nor does it bind or preclude cases or proceedings brought by any governmental entity with regard to tax, civil, or administrative penalties and remedies. The Government Parties agree to make known, if requested by the Company, to any other governmental entity, the Company's voluntary disclosure and diligent and continuing cooperation in this case. In exchange for the Company pleading guilty and complying with all the terms of this plea agreement and the imposed sentence, the Government Parties agree not to initiate or pursue additional criminal charges against the Company arising from activities described above or known to the Government Parties by the date of entry of this agreement related to the harvest, transport, import or sale of plants including plant products. Provided that the Company complies in good faith with all terms of this plea agreement and with the Compliance Plan, the Government Parties agree not to prosecute the Company under the Lacey Act for "due care" violations (16 U.S.C. § 3373(d)(2)) related to its acquisition of plants, including oils, related to activities occurring during the period of Probation. This commitment applies only to the Company, its subsidiaries, and/or directly affiliated business entities, but not to any individuals.

    f.  **Appeal Waiver.**

      (1)    Fully understanding the Company's limited right to appeal its sentence, as explained above in paragraph 7, and in consideration of the concessions and/or commitments made by the Government Parties in this plea agreement, the Company through its corporate authorization knowingly, voluntarily, and expressly waives its right to appeal any sentence imposed upon it, except it does not waive the right to appeal in 18 U.S.C. § 3742(c)(1), which provides that it may not file a notice of appeal unless the sentence imposed is greater than the sentence set forth in this agreement.

      (2)    The Company through its corporate authorization also knowingly, voluntarily, and expressly waives its right to challenge its sentence, and the manner in which the sentence is determined, in any collateral review motion, writ or other procedure, except on the issue of ineffective assistance of counsel.

(3)     The Company through its corporate authorization understands that this waiver of the Company's appeal and collateral review rights concerning its sentence shall not affect the Government Parties' right to appeal the Company's sentence pursuant to 18 U.S.C. § 3742(c)(2) and § 3742(b)(1) and (2).

(4)     The Company through its corporate authorization further understands and agrees that the word "sentence" appearing throughout this waiver provision is being used broadly and applies to all aspects of the Court's sentencing authority, including, but not limited to:  (1) sentencing determinations; (2) the imposition of fines, probation, and any specific terms and conditions thereof; and (3) any orders of restitution and forfeiture.

g.   **Presentence Report and Financial Information.**  Should the Court desire a presentence information report in this case, the Company agrees to provide truthful and complete information, including financial information, as requested by the probation office for the preparation of the Company's presentence report and for determination of the conditions of the Company's probation.

h.   **Corporate Authorization:**  Prior to entry of plea, the Company will provide to the Court and the Government Parties a corporate resolution of the Company's duly authorized entry of plea and compliance with all provisions of this plea agreement, and that the Company's designated officer ("Company Representative") is authorized to appear on behalf of the Company to enter the guilty pleas in the District of Utah and appear for imposition of the sentence.

12.   I understand that I have a right to ask the Court any questions I wish to ask concerning the Company's rights about these proceedings and the plea.

*       *       *       *

The Company Representative makes the following representations to the Court:

1.     I am over the age of twenty-one.  My education consists of a Masters degree from the Academy of Music and Dramatic Arts, Vienna, Austria.  I can read and understand English.

2.     This Statement in Advance contains all terms of the agreements between the Company and the Government Parties; if there are exceptions, the Court will be specifically advised, on the record, at the time of the Company's guilty plea of the additional terms.  I understand the Government Parties and the Company cannot have terms of this plea agreements that are not disclosed to the Court.

15

3.    No one has made threats, promises, or representations to me that have caused the Company to plead guilty, other than the provisions set forth in this agreement.

4.    I have discussed this case and this plea with the Company's lawyers as much as I wish and I have no additional questions.

5.    The Company and I are fully satisfied with the Company's in-house and outside lawyers, who have counseled the Company in this matter.

6.    The Company's decision to enter this plea was made after full and careful thought; with the advice of counsel, and with a full understanding of its rights, the facts and circumstances of the case and the consequences of the plea.

7.    I am not under the influence of any drugs, medication, or intoxicants.

8.    I have no mental reservations concerning the Company's plea.

9.    I understand and agree to all of the above.


DATED this _18th_ day of September, 2017.

Young Living Essential Oils, L.C.
By:    Mary Young
Name: Owner/ CEO
Title:


I certify that I have discussed this plea agreement with the Company and the Company Representative, that I have fully explained its rights to the Company and the Company Representative, and that I have assisted the Company in completing this plea

agreement.  I believe that the Company is knowingly entering the plea agreement with full knowledge of its legal rights and that there is a factual basis for the plea.

DATED this __18th__ day of September, 2017.

_____
GREGORY GOLDBERG
CRAIG GALLI
Attorneys for the Company

17

I represent that all terms of the plea agreement between the defendant and the government have been, or will be at the plea hearing, disclosed to the Court, and there are no undisclosed agreements between the defendant and the United States.

DATED this ___18th___ day of September, 2017.

JOHN W. HUBER
United States Attorney


JARED C. BENNETT
Assistant United States Attorney


ELINOR COLBOURN
Senior Counsel for Wildlife Programs

18

# YOUNG LIVING LACEY ACT COMPLIANCE PLAN

## 1. Compliance Objectives

As an industry leader, Young Living is committed to complying with applicable laws and regulations wherever it does business. As part of this commitment, Young Living requires that its suppliers help it comply with the Lacey Act and other laws protecting plants and regulating the trade of plant products. Young Living's commitment to legal sourcing of plant products is a logical outgrowth of its Seed to Seal process to ensure essential oil purity and authenticity by carefully monitoring the production of its oils. Young Living seeks not only to ensure quality of its products, but to ensure that plant products come from legal and sustainable sources that reflect Young Living's environmental and ethical values. These specific Lacey Act Compliance Program Procedures are referred to throughout this document as the Program Procedures. The Program Procedures describes in greater detail the commitment of Young Living and its employees to legally source plant products.

## 2. Legal Background

The Lacey Act is the oldest wildlife protection statute in the United States. It was originally enacted in 1900 to protect animal species. In 1981, Congress expanded the Lacey Act to cover certain plants and plant parts taken in violation of U.S. domestic law, but not foreign law. In 2008, Congress substantially expanded coverage of the Lacey Act to include all types of plant (including lumber, wood and plant products) and animal materials. The 2008 Amendment was the first ban on wood and plant products that sought to target illegal harvest outside the United States, and to provide better transparency into the source and species of plant and wood products being imported into the United States.

### 2.1 General Prohibitions of the Lacey Act

The Lacey Act makes it a federal crime to import, export, transport, receive, buy, or sell plants or plant products, including essential oils, taken or traded in violation of domestic or foreign laws designed to protect plants, and shipped to or within the United States.[1] This means that the import into the United States of plants or plant products harvested in violation of foreign law violates the Lacey Act. The Lacey Act also creates a "due care" standard, discussed below, to encourage inquiry into legal harvest and sourcing of plant products. In addition, trade in plants or plant products that were exported or imported without the appropriate permits would violate the Lacey Act. The Lacey Act also makes it unlawful to falsify or submit falsified documents, accounts, or records of any plant covered by the Lacey Act or import plants and plant products (with some exemptions) without an import declaration. The import declaration requirement applies to, but has not yet been fully implemented to cover, the plant products traded by Young Living.[2]

---

[1] *See* 16 U.S.C. § 3372(a); 7 C.F.R. § 357.1. Under the Lacey Act, as amended, "plant" includes "[a]ny wild member of the plant kingdom, including roots, seeds, parts or product thereof, and including trees from either natural or planted forest stands." 16 U.S.C. § 3371(f). The full text of the Lacey Act, regulations, and government guidance can be found at http://www.aphis.usda.gov/plant_health/lacey_act/-index.shtml.
[2] *See* USDA, "Lacey Act Frequently Asked Questions," *available at* https://www.aphis.usda.gov/plant_health/lacey_act/downloads/faq.pdf.

## 2.2     Lacey Act Penalties and Forfeiture

Violations of the Lacey Act carry serious penalties for companies and individuals. Individuals and companies may face criminal penalties if they knowingly, and in some cases with lack of due care, violate the Lacey Act. A misdemeanor violation of the Lacey Act, punishable by up to one (1) year in prison and a fine of $100,000 ($200,000 for companies), may result if, in the exercise of due care, the individual or the company should have known that the wood or plant product it purchased was illegally taken, possessed, transported, or sold. Felony culpability, punishable by up to five (5) years in prison and a fine of $250,000 for individuals and $500,000 for companies (as adjusted under the Alternative Fines Act), may arise for knowing violations of the Lacey Act. In addition to criminal penalties mentioned above, the Lacey Act authorizes civil fines and/or forfeitures for violations. Forfeiture of illegally trafficked plants is imposed whether or not the owner knew or should have known of the illegality, although there is a process for remission in certain circumstances. Forfeiture of the instrumentalities of a Lacey Act violation (for example, vehicles used to transport the illegal material, or to harvest or process it) is imposed only after a felony conviction is entered as to an individual or company.

## 2.3     Due Care Standard

Young Living exercises due care and diligence through the research, review, and, as applicable, validation of relevant information regarding plant products it imports from foreign suppliers and purchases from domestic suppliers, merchandise sold in its stores, and the individuals and organizations with which Young Living conducts business. No bright line exists in the law defining what efforts constitute sufficient due care. "Due care" is defined as "that degree of care which a reasonably prudent person would exercise under the same or similar circumstances." This standard requires Young Living to take steps that a reasonable person would take to do his or her best to ensure that Young Living plant products were not harvested, processed, imported, possessed, transported, or sold in violation of the laws of the United States, a State, Indian Tribe, or any foreign law that protects plants.

## 2.4     The Relationship of the Lacey Act, CITES, ESA and Smuggling

The Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES") regulates international trade of certain plant and animal species through export and import permit requirements. Under CITES, plants and wildlife of concern are classified into three categories or appendices based on the perceived risk to those species and protection levels deemed necessary. The documentation requirements for CITES species imposed by the treaty vary depending on the Appendix in which they are listed. CITES is implemented in the United States through the Endangered Species Act ("ESA"). Confusion sometimes exists regarding how CITES and the Lacey Act interrelate and the fact that they impose separate but sometimes overlapping requirements. The following summarizes some of the key aspects of the relationship between the Lacey Act, CITES, and ESA requirements:

*First*, species of plants may be identified as requiring protection under either CITES or directly under the ESA. Plants are listed on the Appendices to CITES by the 180+ countries that are parties to that treaty. The restrictions and requirements of CITES relate solely to international trade in the listed species. Plants are listed directly under the ESA as either endangered or threatened by the U.S. Department of the Interior. The restrictions and requirements of the ESA relate to ensuring the continued existence of those species and

2

include provisions relating to harvest and domestic, as well as international, trade. A plant species may be listed under either CITES, or the ESA, or both. A listed plant or plant product containing a plant listed on CITES or the ESA requires permits or other documentation for import or export.

*Second*, as to CITES-listed plants, import of CITES Appendix I specimens requires a CITES import permit issued by the country of import for those specimens. An export permit or re-export certificate issued by the country of export or re-export is also required. A permit may be issued only if the specimen is not to be used primarily for commercial purposes and if the trade will not be detrimental to the survival of the species. Young Living does not import any Appendix I plant species. For trade in Appendix II listed plant species that do not qualify for an exemption, an entity does not need to obtain a CITES import permit to import the plant specimen into the United States (in contrast to the United States, some countries impose a CITES import permit requirement for Appendix II species), but still must have a CITES export document issued by the country of origin and/or re-export to the exporter. A CITES export document may be issued only if the plant was legally obtained and if the export will not be detrimental to the survival of the species. Re-exports from the United States of any Appendix II listed plant species requires a re-export certificate from the U.S. Fish and Wildlife Service.

*Third*, ESA-listed plant specimens require an ESA import permit from the U.S. Fish and Wildlife Service.

*Fourth*, pursuant to CITES and the ESA, the Animal and Plant Health Inspection Service ("APHIS"), requires any person engaged in the import, export, or re-export of any CITES-listed or ESA-listed plants to obtain a Protected Plant Permit from the Plant Protection and Quarantine Division of APHIS. (APHIS also requires permits for wood products and regulated plant materials, whether or not listed under CITES or the ESA, pursuant to the Plant Protection Act.)

*Fifth*, the ESA implements, through different sections and different regulations, the protections for both CITES species and ESA species. It also sets forth the penalties for violations of those provisions, which are identical. The most serious violations of the ESA as to both CITES and direct ESA violations, constitute criminal misdemeanors.

*Sixth*, the Lacey Act makes it unlawful to import, export, transport, sell, receive, acquire, or purchase any plant (excluding common food crops and common cultivars), *regardless of whether it is listed as protected under the ESA or CITES*, taken, possessed, transported or sold in violation of the laws or treaties of the United States or of an Indian tribe, related to plants. Such underlying laws and treaties include, but are not limited to, CITES, the ESA, and the Plant Protection Act. The Lacey Act also makes it unlawful to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce any plant (excluding common food crops and common cultivars), *regardless of whether it is listed as protected under the ESA or CITES*, taken, possessed, transported or sold in violation of the laws of a State or any foreign law that protects plants or that regulates certain plant related offenses. (These offenses expressly include the failure to pay appropriate royalties, taxes, or stumpage fees required for the plant by the State or foreign law, and any violation of limitations on the export or transshipment of plants.) Thus, compliance with the ESA or CITES, while necessary, is not sufficient to ensure compliance with the Lacey Act. Due care

3

must be taken to ensure that the plant species contained in a product was not illegally harvested or otherwise taken, possessed, transported or sold in violation of an applicable underlying law. The due care standard contemplates that due care efforts will be made to confirm legal harvest and compliance with other laws governing the possession, transport and sale of plants and plant products. Of course, confirmation of legal harvest for plant products purchased domestically and imported by another entity may prove particularly challenging. While the Lacey Act does not impose affirmative requirements on importers or domestic commercial suppliers to conduct due diligence and maintain documentation of legal harvest, processing and import, as discussed below, failure to do so can significantly increase civil and criminal exposure in the event of illegal sourcing of a plant product. The most serious violations of the Lacey Act are criminal felonies.

*Seventh*, the federal smuggling statutes make it illegal to knowingly or fraudulently import or export plants contrary to other underlying laws. Such underlying laws include the ESA and the Lacey Act. Other customs laws make it illegal to make, or procure the making of, a false statement in a declaration without reasonable cause to believe the truth of such statement. Violations of these laws are criminal felonies.

## 3. Conducting Due Care and Diligence

To assist Young Living employees engaged in sourcing plant products, Young Living has identified five general tasks to implement its due care obligations: (1) supplier education, *see* Section 3.1; (2) supplier evaluation, *see* Section 3.2; (3) supplier certification, *see* Section 3.6; (4) risk assessment process, *see* Sections 3.3 and 4; and (5) auditing/monitoring, *see* Section 6. Each of the five tasks must be documented and the supporting documentation retained for at least five years after the last acquisition of the plant product from the supplier. Evaluations will be conducted for all existing Young Living suppliers according to the Young Living Lacey Act Implementation Schedule, and for each new supplier or new product from an existing supplier prior to receipt of an initial shipment. An existing supplier is one from whom Young Living was receiving product at any time between September 1, 2015, and September 1, 2016. A new supplier is one from which Young Living first receives product after September 1, 2016. Young Living has created a set of documents set forth below to be used as compliance tools and internal guidance that it provides all employees involved in sourcing with responsibility for any of the five tasks described above:

- *Young Living Lacey Act Summary for Suppliers*
- *Young Living Lacey Act Compliance Training for Suppliers*
- *Young Living Lacey Act Compliance Supplier Follow-up Due Care Questions*
- *Young Living Certificate of Origin*
- *Sample Outside Counsel Opinion*
- *Sample Summary of Legal Opinion*
- *Confidentiality and Non-Disclosure Agreement*
- *Young Living Compliance Certification - Supplier*
- *Young Living Risk Assessment Matrices*
- *Young Living Supplier Evaluation Checklist*
- *Young Living New Oil and Supplier Approval Checklist*
- *Essential Oils Master Purchase Agreement*

- *Young Living Terms & Conditions Short-Form Purchase Order*
- *Young Living Purchase Order Review Procedures*
- *Young Living Purchase Order & Validation Checklist*
- *Young Living Risk Assessment & Purchase Order Review Procedures Flowchart* (**Exh. A** hereto)
- *Young Living Existing Supplier Flowchart*
- *Young Living New Supplier Flowchart*
- *Young Living Lacey Act Compliance Program Implementation Schedule* (**Exh. B** hereto)

In addition to the five tasks, outlined in more detail below, Young Living will exercise due care by providing its employees with training and mechanisms to report anonymously or with attribution any suspected Lacey Act violation or concern. The Program Procedures will be subject to ongoing analysis and improvement.

To exercise due care pursuant to the Lacey Act and conduct due diligence consistent with other Young Living policies, Young Living uses a risk-based compliance approach in which employees evaluate both its suppliers and the plant products acquired from each supplier. Prior to trade with a new supplier or purchases of new products from an existing supplier, Young Living gathers relevant information and documentation from the supplier. This information is included in a Product Risk Assessment Matrix and Supplier Risk Assessment Matrix (Section 4.0) from which product sourcing decisions can be made.

Implementation of the five general due care tasks referenced above, as well as preparation of the Risk Assessment Matrix discussed below, in no way creates a "safe harbor" from liability under the Lacey Act. Rather, these steps represent the minimum effort needed to evaluate the legality of the import or domestic acquisition of plant products. What constitutes adequate "due care" and the level of effort required will depend on a variety of factors, including the "product risk factors" and "supplier risk factors" discussed below. *See* Sections 3.3 and 4.2. For example, plant products containing CITES-listed plant species will generally be considered higher risk than acquisition of products with more common and non-protected plant species, such as citronella or geranium. Plants and plant products sourced from countries with a high corruption index may require authentication of harvest permits, certificates of origin, customs documents and export permits with assistance of local counsel and agents. Similarly, evasive answers by a supplier to supply chain questions or inconsistencies between export permits and shipping documents raise red flags that may require additional due care efforts.

### 3.1    Supplier Education

Some domestic and foreign suppliers of plant products in general, and essential oils in particular, are unfamiliar with the Lacey Act requirements. Accordingly, Young Living has developed the *Young Living Lacey Act Summary for Suppliers ("*Supplier Summary*")* to provide to its plant product suppliers to acquaint them with the basic requirements of the Lacey Act and to solicit the suppliers' cooperation with compliance efforts as a condition for doing business with Young Living. Both existing and new suppliers are to receive copies of the Supplier Summary as one of the initial steps in an evaluation. Young Living has also developed a slide presentation, *Young Living Lacey Act Compliance Training for Suppliers*, for

use to train new and existing suppliers in Lacey Act requirements. After review of initial information and documentation provided by the supplier in response to their receipt of the Supplier Summary, Young Living may decide to request additional information and documentation set forth below, using the *Lacey Act Compliance Supplier Questionnaire* form or other documented means.

### 3.2    Supplier Evaluation

An important step in engaging new, or reviewing existing, plant product suppliers is to evaluate the risks of the transaction or new relationship. To accomplish this evaluation Young Living considers the "product risk factors" and "supplier risk factors." *See* Section 4.2. Depending on the product risk factors, it is possible that a particular plant species may be so rare or its harvest so restricted, or the corruption of the plant harvesting industry within the country is so pervasive that Young Living may decide not to source the product and to look for plant product substitutes without considering supplier risks. Similarly, the risks associated with a particular supplier may be so high, or the supply chain documentation provided by the supplier so suspect, that Young Living concludes that it should identify other suppliers independent of any consideration of the product risks factors.

The effort and methods required to evaluate individual suppliers will vary depending on a number of factors. For example, large well-known suppliers with websites and substantial public information in the public domain will be easier to evaluate than small less-known suppliers for which little or no public information exists. Moreover, supply chain due diligence will be easier with suppliers that also harvest and process the plant products at issue compared to supply chains with multiple parties in the supply chain with different entities that harvest, transport, process, export and distribute the plant product. Obtaining the identities of others in the supply chain may be difficult where the Young Living supplier views such information as proprietary information. Due care efforts for suppliers with higher risk plant products may require substantial involvement from third-party auditors, local counsel, and in-country contacts.

### 3.3    Analysis of Risk Factors

The following discusses the analysis and use of "risk factors" for both plant products and suppliers.

### Product Risk Factors

- Listing of the plant species (or plant constituents, as applicable) on CITES, the ESA or IUCN-Red List; or identified as endangered, threatened or sensitive in the country of harvest.

- Designated or protected areas from which the harvest of wild plants is subject to restrictions or is prohibited (parks, forest reserves, or other officially designated areas).

- Federal, state or foreign legal requirements that protect plants through the regulation of harvest, possession, transport, processing, import, export or sale of plants.

- Royalties, taxes or stumpage fees required for the harvest, possession, processing, transport, import, or export of plants.

- Federal, state or foreign legal requirements providing for permits, licenses or authorizations for the harvest of the plant.

- Federal, state or foreign legal requirements that impose limits on the harvest, transshipment or export of the plant.

- Reported instances of illegal or unethical harvesting in the relevant geographical region or related to the relevant product or species.

- Potential for confusing or substituting the plant species with another species.

- Sustainability of the harvest method.

- Reliable tests (e.g., DNA, isotope testing, gas chromatography) or other analytical methods available and being used to determine and verify species (and constituent species, if applicable), genus, and growing region.

- Results of in-person audits or other assessments of harvest locations and/or harvesters (as applicable).

- Harvest country corruption rating.

**Supplier Risk Factors**

- Corruption rating of country of vendor/supplier.

- Vertical integration of the harvester, processor, exporter and/or importer.

- Supplier's past and present ability to provide sufficient and credible documentation consistent with legal harvest requirements.

- Supplier's past and present ability to provide sufficient and credible documentation to demonstrate chain of custody commencing with harvest.

- Whether the supplier sells high risk plants to Young Living.

- Legality or ethical concerns regarding supplier raised by third-party or government sources.

- Unusual "deals" or sales methods (e.g., kickbacks).

- Relative market and offer prices.

- Nature and results of any prior in-person audits (or other evaluations) of the supplier's place of business (and others in the supply chain) by a person or organization with specialized industry expertise.

7

- The length of the relationship between Young Living and the supplier.

- Whether the supplier has provided company policies or procedures for sourcing plant products and evidence of implementation.

- Supplier willingness to enter into a written contract, consent to audits, participate in training, and develop a written compliance program.

Each time Young Living personnel evaluate a supplier and plant product, they should conduct an internet search to identify the most recent legality concerns for that product or supplier. The search should include regional legality concerns, the history of the supplier, and issues related to the specific plant species being evaluated. The efforts to determine current legality concerns should include information from multiple sources and should be documented and retained. This can occur using searches of government compliance records, subscription supplier data bases, interviews of regulatory authorities, local counsel legal opinions, and other appropriate means based on the level of risk and local law pertaining to data privacy and other matters. Though internet-based resources are subject to change and may not be entirely reliable, they constitute a good starting point of research.[3]   Moreover, reliable sources of information regarding the business and government corruption on a country-by-country basis include Transparency International (http://www.transparency.org/country) and the World Bank (http://data.worldbank.org/indicator/IQ.CPA.TRAN.XQ).   Product pricing information can sometimes be found for plant products on Alibaba (https://www.alibaba.com/), and other sources. However, internet research results alone may be insufficient or require interpretation that may require use of outside experts. *See* Section 3.5. The frequency of conducting supplier reevaluations of existing suppliers is set forth in Section 4.0 below.

### 3.4    Supply Chain Documentation

Ideally, the review of supply chain documentation will establish an unbroken and verified chain of custody of the plant product from the harvest location, through transport and processing, through export and import to the United States, through subsequent distribution in the United States, leading to receipt and acceptance by Young Living.   Supporting documentation should confirm that the plant products received by Young Living are the same as the plant products referenced in documents compiled and reviewed as part of the due care process. The types of supply chain documents typically relied upon for Lacey Act due care purposes include, but are not limited to, the following depending on the circumstances and as applicable pursuant to legal requirements:

- Harvest Permit
- Processing Permit
- Transportation Permit
- CITES Export Permit Issued by Country of Origin
- CITES Import Permit Issued by Country of Intermediate Supplier (if required)

---

[3] Other sources of information on wood harvest legality issues include, but are not limited to:  Global Forest Registry (http://www.globalforestregistry.org), the Global Forest Trade Network Guide to Legal and Responsible Sourcing (http://sourcing.gftn.panda.org/), Keep it Legal Country Guides, the Forest Legality Alliance (http://www.forestlegality.org/), NEPCon (http://www.nepcon.org/), and European Union's Forest Law Enforcement, Governance and Trade (FLEGT) Action Plan (http://www.flegtlicence.org/).

- CITES Re-export Certificate Issued by Country of Intermediate Supplier
- Custom declarations (from both country of import and export if applicable)
- APHIS Protected-Plant Permit
- Shipping Documents (e.g., invoices, bills of lading, packing slips, purchase orders, certificates of origin, inspection certificates, etc.)
- Phytosanitary Certificates of Origin or Certificates of Analysis
- Third party certification
- Any other chain of custody documentation

In some parts of the world, such documents are counterfeited so attention must be paid to the reliability of the source of the documents and any red flags regarding the authenticity and veracity of the supply chain custody documentation. One such red flag is whether the documentation originates from a country with a high corruption index. Consideration should be given to whether the scientific literature supports representations regarding the country of origin. Similarly, an evaluation of the logistical information (such as trade routes) included in supply chain documentation may require confirmation to ensure legal sourcing. This level of analysis may require the assistance of experienced foreign counsel and plant-trade consultants.

Another challenge in many developing countries and even in some developed countries, is that the transactions between harvesters, distillers and suppliers may be informal, oftentimes based on undocumented cash transactions. While this may be permissible under local laws and conventional commercial practice, such transactions make it difficult to confirm legal harvest through the normal due care process. While Young Living sourcing personnel may decline to source plant products where required supply chain documentation is missing (such as harvest permits, inspection certificates, etc.), it may be possible to confirm legal harvest, processing, transport, and export through other means (such as through onsite audits) without complete supply chain documentation. In addition, Young Living may decide to provide suppliers with the *Young Living Certificate of Origin,* which requires the inclusion of sourcing information allowing independent verification and follow-up with harvesters and distillers to confirm legal harvest. Depending on local harvest and processing requirements, the *Young Living Certificate of Origin* may require modification to reflect applicable requirements. Verification of the documentation is more important than the amount of documentation obtained. No document guarantees Lacey Act compliance; rather, compliance requires appropriate due care given the totality of circumstances.

### 3.5   Use of Specialized Outside Counsel, Local Counsel, and Plant-Trade Consultants, and Scientists

There may be times when identifying the legal requirements for harvest, transport, processing, export, import, and re-export of plant products, as well as applicable royalties and fees, may not be possible for Young Living personnel by relying solely on the supplier. In such case, at least for high risk suppliers of plant products, engaging the services of specialized U.S.-based counsel and experienced foreign counsel may be necessary to identify applicable legal requirements. *See Sample Outside Counsel Opinion.* Young Living may decide to provide less sophisticated and knowledgeable local suppliers with a summary of the legal opinion that succinctly identifies applicable sourcing requirements so that the supplier can confirm and produce required supply chain documentation. *See Sample Summary of Legal Opinion.*

In addition, plant-trade consultants, botanists and professional foresters can assist with questions regarding plant names and species, and harvest practices. In addition to paid consultants, government and non-government organization (NGO) experts may offer valuable assistance. Qualified experts and trained Young Living personnel can also conduct harvesting-location and processing-location audits of the supplier or source operations. The higher the plant product risk or supplier risk, the more likely some kind of audit or other assessment may be needed. Short of in-country source audits, legal counsel and plant-trade consultants can interview suppliers and request and review supply chain documentation.

Sometimes a supplier may be reluctant to share sourcing information with Young Living that the supplier considers confidential or proprietary business information. Such information can include information regarding harvest location and methods, sourcing, processing, and customer and supplier identities relating to plant products to be sold by a supplier to Young Living. If a supplier objects to providing confidential information, Young Living and the supplier may enter into a *Confidentiality and Non-Disclosure Agreement,* which will enable the supplier to provide the confidential information to a reputable plant-trade consultant for review and assessment without disclosing to Young Living the underlying confidential business information. The plant-trade consultant shall be approved in writing by the Chief Compliance Officer. Such a consultant will be required to retain all records relating to the assessment until five years after it receives notification from Young Living that it is no longer using that supplier.

### 3.6    Supplier Certification

After Young Living personnel have communicated in writing with the supplier the Lacey Act prohibitions, provided the supplier with Young Living's Lacey Act strict compliance policy, and confirmed that the supplier understands the information, it will require the supplier to review and execute the *Young Living Lacey Act Compliance Certification-Supplier*. Each year thereafter, Young Living will require each supplier to review and execute the same. Review and execution of this document is a condition for ongoing business with Young Living. As part of the certification process, Young Living personnel will work with each supplier to confirm that the supplier has developed and implemented its own compliance program. For major suppliers with sourcing to Young Living of plant products harvested, processed, and/or exported from multiple countries, the supplier should have a compliance program that covers the laws of each country which imposes requirements or restrictions on the harvest or trade of the plant products sold by the supplier to Young Living.

## 4.  Risk Assessment Matrices

Once the risk factors in Section 3.3 and any other relevant risk factors are identified, Young Living personnel prepare the *Young Living Product Risk Assessment Matrix* or the *Young Living Supplier Risk Assessment Matrix* to assign a risk level for each factor and overall risk score for the plant product or supplier at issue.

### 4.1    General Approach to Risk Scores

Young Living will complete a risk rating for each individual supplier and plant product. Each risk factor is assigned a risk score of "low," "medium," or "high." Two important aspects of the risk scoring approach require explanation. First, with respect to determining a supplier

10

risk score, a supplier can only attain a "low risk" score based on a sufficiently complete and verified set of information. If information is incomplete or unverified, the supplier will be considered at a minimum "medium risk" and the supplier will be subject to specific compliance measures and/or obtaining additional information or documentation to mitigate risk. Second, with respect to determining a plant product risk score, the risk score is automatically designated as high risk if the plant species has been identified as threatened or protected. *See* Section 4.3. Thus, even though a supplier is well known and has a robust compliance program, sourcing personnel must treat the sourcing of a high risk plant product as a high risk transaction regardless of the risk rating of the supplier. This approach reflects the reality that even large well-regarded suppliers use different personnel and supply chains depending on the plant product and country of origin.

### 4.2    Supplier Risk Ratings

- **High Risk Supplier** – A supplier is considered "high" risk when issues of concern have been identified based on credible information that warrant a supplier risk rating of high risk. In such case, Young Living sourcing personnel may either pursue efforts to manage or mitigate the supplier risk, or, if mitigation of the risk is not possible, find an alternative supplier given the nature of the risk. Young Living has adopted the goal to eliminate all high risk suppliers whose risks cannot be mitigated or managed to at least a medium risk level.

- **Medium Risk Supplier** – A supplier is considered "medium" risk when no issue of concern is identified, but existing information is incomplete or unverified to warrant a supplier low risk rating, or unmitigated risks have been identified to warrant a medium risk rating. In such case, Young Living sourcing personnel may either pursue efforts to manage or mitigate the supplier risk, or find an alternative supplier given the nature of the risk.

- **Low Risk Supplier** – A supplier is considered "low" risk when no issue of concern is identified based on sufficiently complete and verified existing information and documentation.

- **Notes and Action Items** - The "Notes and Action Items" field in the Supplier Risk Assessment Matrix provides explanatory information for each risk rating and briefly describes planned actions to mitigate risks identified. The field can also reference supporting documentation. Each risk factor rating should be supported by a brief note.

Young Living personnel total the numeric risks assigned to each risk factor to determine an overall risk score for a supplier based on the ranges set forth below. The overall risk score of a supplier or plant determines the level of approvals needed to purchase a plant product or conduct business with the supplier at issue:

- **Low Risk Supplier Rating** – The total risk score falls under 20. No additional approvals are needed to subsequently pursue engaging in business with a foreign or domestic supplier (other than the initial approval by the Chief Compliance Officer for sourcing from a new supplier).

11

- **Medium Risk Supplier Rating** – The total risk score falls between 20-27. Approval of the Chief Compliance Officer is required to pursue engaging in business with the foreign or domestic supplier. Such approval shall be documented with written explanation of the decision (usually in the form of a sourcing decision memorandum maintained in the file for the supplier or plant product), and may include references to a legal opinion, recommendations from local or specialized outside counsel, or other applicable information compiled through the due care process to manage and/or mitigate risk.

- **High Risk Supplier Rating** –The total risk score falls above 28. Approval of the Chief Compliance Officer <u>and</u> Chief Executive Officer is mandatory to pursue engaging in business with the foreign or domestic supplier. Such approval shall be documented with written explanation of the decision, and may include references to a legal opinion, recommendations from local or specialized outside counsel, or other applicable information compiled through the due care process to manage and/or mitigate risk. Moreover, even where the total risk score does not fall above 28, a single high risk factor, such as a supplier engaging in a suspicious action, may require professional judgment to treat the supplier as high risk requiring approval of both the Chief Compliance Officer <u>and</u> Chief Executive Officer, or to conduct additional due diligence prior to making the final sourcing decision.

### 4.3    Plant Product Risk Ratings

- **Automatic High Risk Plant/Plant Product Rating** – If a plant product contains a plant species listed on CITES or ESA, is listed on the International Union for Conservation of Nature ("IUCN") Red List ("near threatened" category or higher), or is listed as protected, threatened or sensitive under local law in the country of harvest, then the overall risk score for the plant product will automatically be designated high risk.

- **High Risk Plant/Plant Product** – In addition to the factors triggering an automatic high risk rating of a plant product described above, a plant product is considered "high" risk when issues of concern have been identified based on credible information that warrant a plant product high risk rating based on the applicable risk factors. *See* Section 4.3. In such case, Young Living sourcing personnel may either pursue efforts to manage or mitigate the plant product risk, or find a replacement for the plant product given the nature of the risk.

- **Automatic Medium Risk Plant/Plant Product** – When information obtained through the due care process identifies significant taxes, duties and/or royalties associated with harvest, process, transport or export of a plant product, then the overall risk score for the plant product will automatically be considered at minimum a medium risk. This is due to the challenges associated with verifying and documenting payment of required taxes, duties and/or royalties by all parties subject to the requirements in the supply chain.

- **Medium Risk Plant/Plant Product** – In addition to the factors triggering an automatic medium risk rating of a plant product described above, a plant product is considered "medium" risk when no issue of concern is identified, but existing information is incomplete or unverified, or existing information identifies issues warranting a medium

12

risk rating based on the applicable risk factors.

- **Low Risk Plant/Plant Product**– A plant product is considered "low" risk when no issue of concern is identified based on relatively complete and verified existing information and documentation.

- **Notes and Action Items** – The "Notes and Action Items" field in the Plant Product Risk Assessment Matrix provides explanatory information for each risk rating and briefly describes planned actions to mitigate risks identified. The field can also reference supporting documentation. Each risk factor rating should be supported by a brief note.

Young Living personnel total the numeric risks assigned to each risk factor to determine the overall risk score for a plant product based on the ranges set forth below. As indicated above, if a plant product is considered high risk because it is listed or protected as described above, then the overall plant product risk score will automatically be considered high risk, regardless of the numeric score. If information obtained through the due care process identified significant taxes, duties and/or royalties associated with the harvest, processing, transport or export of a plant product, then the overall plant product risk score will automatically be considered at a minimum medium risk, regardless of the numeric score. Otherwise, the overall score is based on the ranges described below. The overall risk score of a plant determines the level of approvals needed to purchase the plant product at issue:

- **Low Risk Plant/Plant Product Rating**– The total risk score falls under 20. No additional approvals are needed to subsequently purchase the plant or plant product (other than the initial approval by the Chief Compliance Officer for sourcing from a new supplier).

- **Medium Risk Plant/Plant Product Rating**– The total risk score falls between 20-27. Approval of the Chief Compliance Officer is required for future purchases of the plant or plant product. Such approval shall be documented with written explanation of the decision (usually in the form of a sourcing decision memorandum retained in the file for the plant product), and may include references to a legal opinion, recommendations from local or specialized outside counsel, or other applicable information compiled through the due care process to manage and/or mitigate risk. Purchase Order Review (further described below) is required for each transaction involving a medium risk plant product.

- **High Risk Plant/Plant Product Rating** –The total risk score falls above 28. Approval of the Chief Compliance Officer and Chief Executive Officer is mandatory for future purchases of the plant or plant product. Such approval shall be documented with written explanation of the decision, and may include references to a legal opinion, recommendations from local or specialized outside counsel, or other applicable information compiled through the due care process to manage and/or mitigate risk. Purchase Order Review is required for each transaction involving a high risk plant product.

13

### 4.3     Plant Product Risk Factors and the Exercise of Professional Judgment

The *Young Living Lacey Act Plant Product Risk Assessment Matrix* contains twelve "product risk factors." Determining the risk score under each factor requires professional judgment and knowledge of the plant species, harvest methods, test methods, local laws, and regional issues. Each product risk factor is briefly discussed below:

1. *Listing of plant on any Appendix of CITES or the ESA, IUCN-Red List ("near threatened" or above), or identified as endangered, threatened or sensitive in the country of harvest.*

   CITES is a multilateral treaty ratified by over 180 countries and the European Union designed to ensure that international trade in specimens of wild animals and plants does not threaten their survival in the wild. Currently over 35,000 species of plants are protected by CITES against over-exploitation. Each protected species is included on one of three lists, called appendices. The listing of the species reflects the extent of the threat and the controls that apply to the trade of that species. The "ESA", enacted by Congress in 1973,[4] serves as the enacting legislation to implement the provisions of CITES in the United States. A listing of a plant species under CITES or the ESA indicates that the species requires some degree of protections due to risks to the species. In contrast, the Red List published by the IUCN classifies all animal and plant species for which sufficient data exists based on rate of decline, population size, area of geographic distribution, and degree of population and distribution fragmentation. The lowest risk category – Least Concern – does not qualify for a more at risk category because the species is widespread and abundant. Individual countries may also publish their own lists of at risk species in their respective countries that warrant some level of protection. Listing of a plant species on CITES, ESA, a list specific to the country of origin, or on the IUCN Red List (with a category of "near threatened" or above) requires a high risk classification for plant products containing the listed plant species notwithstanding any other considerations.

2. *Designated or protected areas from which the harvest of wild plants is subject to permitting, or prohibited (e.g., parks, forest reserves, or other officially designated areas).*

   There are many protected areas in different regions where the harvest of plants is either strictly prohibited or highly regulated. It is important to understand where the plant products are actually harvested and confirm that harvest occurred in compliance with the local laws and regulations.

3. *State or foreign legal requirements that protect plants through the regulation of harvest, possession, transport, processing, import, export, or sale of plants or plant products.*

---

[4] 16 U.S.C. § 1531 et seq.

In some regions and areas, specific laws and regulations address the harvest, harvest methods, possession, transport, processing, import, export, or sale of the plants, and require specific compliance with those laws and regulations.

4.  *Royalties, taxes, or stumpage fees required for the harvest, possession, processing, transport, import, or export of plants or plant products.*

It is important to confirm that the supplier and others in the supply chain have complied with and paid the appropriate royalties, taxes, or stumpage fees required for the harvest, possession, processing, transport, import, or export of plants or plant products.

5.  *State or foreign legal requirements providing for the permits, licenses or authorizations for the harvest of the plant.*

State and foreign laws in the country of harvest may require licenses, permits and other authorizations for the harvest of certain plants harvested from public or private lands for commercial use. There are also laws and regulations that restrict the amount of certain plants that are allowed to be harvested. Such limits are often set forth as conditions or restrictions in the harvest permits. It is important to understand the specific laws and requirements that authorize the harvest of plants and what, if any restrictions apply to the quantity allowed to be harvested.

6.  *State or foreign laws that impose limits on the harvest, transshipment or export of the plant.*

The more complex and restrictive local laws governing the harvest, transport, processing, or sale of plants or plant products are, the higher risk the trade in that particular plant product. This is particularly true of laws protecting wild growing plants found in protected areas. In contrast, general laws pertaining to agricultural practices and licensing of cultivated plants create lower risks. Some laws (such as child labor or worker protection laws) have no bearing on Lacey Act compliance because they neither protect nor otherwise regulate plants, and do not impose taxes, royalties or stumpage fees required for the plant, and do not govern export or transshipment of plants.[5] However, failure to comply with any export requirement, duty, tax or tariff relating to a plant product imported to the United States constitutes a Lacey Act violation regardless of whether the underlying export control is designed to protect the plant species.

7.  *Reported instances of illegal or unethical harvesting in the relevant geographical region or related to the relevant product or species.*

Illegal and non-sustainable harvesting can be rampant and environmentally destructive, especially in developing countries with extreme poverty, weak enforcement, and plants from which essential oils or other valuable products can be distilled or extracted at low cost but which command a high price for the finished product. Reported instances of illegal harvesting in the source country from

---

[5] *See* 16 U.S.C. § 3372(a)(2)(B).

government and credible NGO sources place importers of the plant products on notice of the high risk nature of sourcing the plant product from that country.

8. *Potential for confusing the plant species with another more rare species.*

A rare but highly prized plant species that can be easily mistaken for a legally harvested plant species commonly motivate unscrupulous harvesters to falsify government harvest and transport documentation to conceal illegal harvest, thereby creating risks to importers of the plant products.

9. *Sustainability of the harvest method.*

The harvest method itself can significantly affect overall risk to the species and legal compliance risks. First, harvesting wild growing plants (also known as "wild crafting") may involve less abundant plant species than cultivating plants grown from seeds or seedlings. Second, pruning the leaves and blossoms of living plants obviously creates reduced risks to the plant or tree than logging or removing and processing an entire plant. Some countries allow the harvest by pruning of wild high-value plants using manual scissors, but outlaw mechanized pruning or use of hedge-bills, making enforcement of legal harvest methods difficult. Thus, information regarding the legal and sustainable harvest methods can greatly affect the risk of sourcing certain plants.

10. *Protected status of any species used as constituents in the plant product*

While Young Living currently does not purchase blends, some blended plant products are purchased as single constituent bulk products those that require identification and due care of the constituents of the plant product and the same level of due care effort because the Lacey Act includes no de minimis standard for constituents. The more complex the blend, the more difficult this process may prove creating additional risks from sourcing a blended plant product.

10. *Reliable tests (e.g., DNA, isotope testing, gas chromatography) or other analytical methods available and used to determine and verify species, genus, and growing region.*

The existence of reliable tests to confirm the constituents and even geographic source location can reduce risks of inadvertently sourcing an illegally harvested plant species. The lack of reliable tests can increase risks and require other forms of due care.

11. *Results of in-person audit of harvest locations and/or harvesters.*

In-person audits of harvest locations and/or harvesters of a plant species can provide additional supply chain transparency and reduce risks of sourcing an illegally harvested plant species.

12. *Country-level corruption rating of country of plant's harvest, processing and export*

16

Even when a government has enacted laws and regulations to reduce risks from overharvest and non-sustainable harvest practices, unscrupulous harvesters, processors and suppliers in countries with high levels of business and government corruption can avoid compliance with local laws. A number of organizations rank government and business corruption in each country.[6]

### 4.4    Mitigating Risk

Young Living sourcing personnel should work with the supplier to lower plant product or supplier risk factors by obtaining additional information or implementing measures to mitigate sourcing risks. Risks can also be mitigated by substituting ingredients or supplies from lower risk plant products and/or suppliers. Various less tangible considerations could justify engaging in a transaction involving otherwise higher risk products and suppliers. These include, among others, factors not identified in the matrices, such as on-site third party audits and other assessments, the quality of the supplier's compliance programs based on close cooperation and a long relationship with the supplier; product risk mitigation measures, and other appropriate considerations. Whatever the explanation or risk mitigation strategy, it should be reasonable and well documented in sourcing approval memoranda or other documents, such as purchase order review documents.

Prior to entering into a business transaction for a new product with a new or existing supplier, Young Living personnel may decide to use the *Young Living Supplier Evaluation Checklist* to ensure that all of the steps in evaluating the supplier for purposes of Lacey Act due care requirements and Young Living policy have occurred. Once the steps have been completed, the *Young Living New Oil and Supplier Approval Checklist* can be used to document steps taken to support sourcing decisions described in sourcing memoranda. The sourcing decision and any conditions, restrictions, and limitations for purchasing a medium or high risk plant product or engaging in business with a medium or high risk supplier are captured in a sourcing decision memorandum consistent with the risk assessment review process.

### 4.5    Frequency of Risk Assessment Reviews

The risk score of a plant product or supplier determines the frequency of future risk assessment review based on the following:

- **Low Risk Rating**– Suppliers and plant products assessed as low risk shall be evaluated at least every two years and more frequently based on new information. Purchase order reviews for low risk plants occur every six months. *See* Section 5.1.

- **Medium Risk Rating**– For suppliers and plant products assessed as medium risk, sourcing personnel shall perform a risk assessment matrix review at least every 18 months, and more frequently based on new information learned from the purchase order review process. *See* Section 5.2.

- **High Risk Rating**– For suppliers and plant products with high risk scores, sourcing

---

[6] The leading corruption indices which Young Living routinely uses are published by Transparency International, http://www.transparency.org/, and the World Bank, http://data.worldbank.org/indicator/IQ.CPA.TRAN.XQ.

personnel shall perform a risk assessment matrix review at least every year, and more frequently based on new information learned from the purchase order review process. *See* Section 5.2.

The process to review and update Risk Assessments described above is separate from the more frequent Purchase Order Review which occur on a transactional basis. As explained below, purchase order review of low risk plant products shall be completed no less than every six months prior to issuance of a purchase order or payment to a supplier of the low risk plant product at issue. Further, a Purchase Order Review shall be conducted for each shipment of a medium risk and high risk plant product subject to conditions and instructions set forth in the relevant Sourcing Decision Memorandum. *See* Section 5.

## 5. Purchase Order Review Procedures

Young Living typically uses purchase orders to place orders with suppliers in a convenient and expeditious manner. Purchase orders should only be used with suppliers that have executed a current *Essential Oils Master Purchase Agreement* or agreed to the short-form Purchase Order with attached Terms and Conditions. Further, as explained in Section 4.0, approval for sourcing medium risk plant products or from a supplier with a medium risk rating requires approval of the Chief Compliance Officer, and sourcing high risk plant products or from a supplier with a high risk rating requires approval of the Chief Compliance Officer and concurrence of the Chief Executive Officer. Decisions to source from or not source from a medium or high risk supplier, or to source or not source a medium or high risk plant product are memorialized in Sourcing Decision Memoranda. Such Sourcing Decisions may be issued at the time the Risk Assessment Matrix for the supplier or plant product at issue is completed, following a purchase order review when new information is obtained that can affect the risk assessment, or at the designated time for renewed risk assessment of the plant product or supplier. Sourcing Decisions are based on information obtained during the due care process and should reflect information contained in the Risk Assessment for the supplier and plant product at issue. Sourcing Decisions will address in detail issues related to that plant product or supplier and whether the sourcing decision reached is approved or denied.

Prior to the importation of new plant products from new suppliers under a purchase order (particularly involving high risk plant products or high risk suppliers), Young Living personnel should compile and evaluate the supply chain documentation referenced in Section 3.4 above. Purchase order review from existing suppliers should occur on a routine basis with more detailed review for each shipment of medium and high risk plant products. The *Young Living Purchase Order Review Procedures* describe the more detailed and frequent purchase order review process for medium or high risk plant products, which should be documented on the Young Living Purchase Order Review and Validation Checklist and retained in each purchase order file for the plant product at issue. *See also Young Living Risk Assessment & Purchase Order Review Procedures Flowchart.* As previously explained, the review of supply chain documentation should establish an unbroken and verified chain of custody of the plant product from the harvest location to receipt and acceptance by Young Living, evidencing lawful harvest, transportation, processing, exportation and importation. In rare cases, it may be necessary to complete purchase order review after a plant product has been acquired. This should be the exception, not the rule, given that the Lacey Act may impose liability in certain circumstances for the acquisition of illegally harvested or imported plant products.

18

### 5.1 Purchase Order Review Process for Low Risk Plant Products

In addition to confirming completion of the due care tasks described in Section 3.0, transactions involving low risk plant products should be periodically reviewed and documented by Young Living sourcing personnel. Such review shall be conducted no less than once every six months, and shall include, prior to the issuance of a purchase order or payment, a review of the chain of custody documentation and documents establishing compliance with applicable laws as identified through the due care process. The outcome of the purchase order review may include additional required actions, such as performing a new Risk Assessment, or the cessation of further purchases, and may require another purchase order review prior to the next six month review. Purchase order review of low risk plant products should include a review of past purchase order review outcomes.

### 5.2 Purchase Order Review Process for Medium or High Risk Plant Products

For purchases of medium or high risk plant products, prior to issuance of any purchase order to a supplier of a medium or high risk plant product, Young Living sourcing personnel, where applicable, will: (a) review and catalog all supplemental documentation showing the harvest location, harvest legality (including confirmation that the amount of plant product to be purchased coincides with any applicable limitations on harvest quantity, export, etc.), and chain of custody used to fulfill the purchase order at issue; (b) review relative market and offer prices; (c) determine whether the supplemental documentation has been previously used; (d) determine whether all supplemental documentation is capable of supporting the quantity of plant product included in the purchase order; and (e) determine whether all supplemental documentation is internally consistent (e.g., the plant species is the same across all documents, there are no extensive temporal gaps, the timing is rational, the species actually grows in that area, etc.). Purchase order review will also include reviewing any Sourcing Decision Memoranda covering the plant product and/or supplier at issue to ensure that any additional due care tasks identified by the Company's Chief Compliance Officer have been addressed. As with purchase order review for low risk plant products, the outcome of the purchase order review (conducted for each purchase order issued), shall be documented by Young Living sourcing personnel and retained, and may include additional required actions, such as performing a new Risk Assessment or the cessation of future purchases. Purchase order review of medium and high risk plant products will therefore also include a review of past purchase order review outcomes.

If any purchase order is not accompanied by sufficient supplemental documentation to support legality of harvest, processing, transportation, exportation and importation, then the plant product shall not be accepted until supplemental documentation and information is provided. If a shipment already received is determined to have violated applicable laws governing harvest, transport, processing, export or import, remediation and mitigation may be required as discussed in Section 7.0.

## 6. Auditing and Monitoring

Young Living's Chief Compliance Officer is responsible for preparing an annual Lacey Act Auditing and Monitoring Plan at the beginning of each calendar year ("Audit Plan"). The objective of the Audit Plan is to ensure that the Compliance Plan is effectively ensuring compliance with the Lacey Act. The Audit Plan should reflect the lessons learned from

implementation of the Program Procedures during the previous year, the risks based on the risk assessments conducted to date, and the priorities reflected in the Lacey Act Compliance Implementation Schedule ("Implementation Schedule"). The Audit Plan should also describe the anticipated use of and budget for internal or third-party audit and monitoring resources, other consultants, and legal counsel. Audit activities may include field inspections of harvest and distillation operations; interviews of harvesters, distillers, customs brokers, and regulatory personnel; and desk audits (involving review of documents and follow-up phone calls to verify that Company requirements are being met). Other audit tools may include supplier surveys, plant product sampling to verify species and other pertinent information, and research regarding harvesting practices. As a result of audits, Young Living sourcing personnel with assistance from auditors and legal counsel will identify necessary corrective actions that ensure that ongoing monitoring is incorporated into Young Living's operations. An audit schedule should be established for each supplier and plant product depending on the level of risk, as appropriate, and other auditing and monitoring tasks should be included in the Implementation Schedule.

## 7. Remediation and Mitigation

Young Living's Chief Compliance Officer shall be responsible for remediation and mitigation relating to the Program Procedures. Corrective action plans and verification procedure(s) shall be used when non-compliance is detected during audit monitoring and/or review processes, or otherwise. If, at any point in the procurement process, Young Living personnel become aware that a product does not adhere to applicable requirements, Young Living will reject the shipment and return (if return would be legal), refuse to import, and/or refuse receipt of the product, as appropriate. Depending on the information Young Living receives regarding non-compliance, including any notices from regulatory authorities, quarantining non-compliant products already accepted into inventory, and/or cessation of purchase order issuance for the plant product and/or to the supplier, may be required. As needed and where feasible, Young Living personnel may require laboratory analysis to verify product composition of a raw material and to verify representations made by the supplier regarding the same.

If Young Living personnel involved in the sourcing of plant products determine that Young Living is internally incapable of sufficiently auditing or evaluating a supplier or a plant product consistent with the Lacey Act Implementation Schedule, such personnel should report that concern through appropriate channels to the Chief Compliance Officer or to Young Living's compliance hotline (1-844-297-6336 or YoungLiving.EthicsPoint.com). As needed, the Chief Compliance Officer shall make a record of the concern, form an appropriate team to investigate the concern, and where appropriate, either increase internal capabilities as needed or engage a third-party to conduct the activities that Young Living cannot sufficiently complete internally. If the determination is made that the reported concern was unfounded, the Chief Compliance Officer (or outside counsel or plant-trade consultants engaged to investigate the issue) shall make a record of that determination and the basis for the same. Similarly, if the investigation confirms the accuracy of the issue of concern, a record of that determination along with a correct action plan should be prepared to address the issue. Investigations of significant compliance matters should normally be led by specialized outside counsel who report to Young Living's General Counsel or Audit Committee.

## 8. Training and Communication

Young Living managers of the departments with duties associated with Lacey Act requirements bear the primary responsibility for ensuring that all necessary employees receive the proper training. The Chief Compliance Officer is responsible for providing training and updates related to the requirements of the Lacey Act and applicable regulations as well as Young Living's policies and procedures. Annual refresher training regarding the Lacey Act and the Program Procedures is required for all employees involved in sourcing or procurement of plants or plant products.

## 9. Non-Compliance and Disciplinary Action

A Young Living employee found to have violated the Program Procedures will be subject to appropriate disciplinary action, including possible termination. Young Living will maintain records related to any such disciplinary action related to Lacey Act compliance in the personnel files of any affected employee.

## 10. Reporting Non-Compliance and Non-Retaliation

Directors, officers, employees, suppliers and agents will be directed to report any potential misconduct if they have a good faith belief that there may be a violation of law, the Lacey Act, or the Program Procedures, or an effort to impede implementation of any aspect of the Program Procedures. Reports may be made anonymously through the compliance hotline (1-844-297-6336 or YoungLiving.EthicsPoint.com), or to managers, the General Counsel, the Chief Compliance Officer, or the Independent Member of the Young Living Board of Managers.

## 11. Records Maintenance

Young Living will retain all records related to Lacey Act compliance for any acquisition a minimum of five years from the date of purchase of the acquired plant product.

## 12. Implementation Schedule

The Program Procedures reflects Young Living's first attempt at developing a comprehensive compliance program covering the import and domestic acquisition of plants and plant products. For several reasons, full implementation of the Program Procedures will take time and significant resources and efforts. *First*, the majority of Young Living's suppliers were unaware of the due care requirements and restrictions covered by the Lacey Act until the Company brought them to their attention. Providing the Company's suppliers with sufficient information to assist with the due care process has required time and often involves multiple discussions with suppliers and their representatives and legal counsel simply to help them respond to basic questions. *Second*, to Young Living's knowledge, no other company in the essential oil industry has developed and implemented a comprehensive Lacey Act Compliance Program at the time Young Living commenced development of its own program. Thus, the Company had no template from which to work. Young Living has looked to other industry sectors, such as the lumber and timber industry, for examples of corporate Lacey Act compliance programs. Young Living also engaged experienced outside counsel and plant trade consultants in this effort. *Third*, unlike the lumber and timber industry that trades in a

21

relatively small and limited number of tree species, the essential oils industry trade involves plant products from hundreds of plant species with many plant products containing oils from multiple plant species. Conducting due care efforts for each of its plant products has required substantial effort and resources. *Fourth,* the lumber and timber trade industry also has the benefit of import declarations which provides data useful for performing supply chain and other due care tasks. Due care performed without import declarations, which currently do not apply to trade in essential oil plant products, requires a greater commitment of time and sources.

For the reasons stated above, full rollout and complete implementation of the Program Procedures will be ongoing as the Company helps educate its suppliers and others in the industry of Lacey Act requirements. Nevertheless, Young Living is proud of its Program Procedures which is the first of its kind in the industry. To ensure expeditious and rigorous implementation of the Program Procedures, the Company has developed the Implementation Schedule commencing with the highest risk plants sourced from the highest risk countries and suppliers. Like the Program Procedures, the Company will review and revise the Implementation Schedule on an ongoing basis (but not less than once a year for a comprehensive review), to reflect progress being made, challenges encountered, changes in risk priorities, and lessons learned. The Company will prepare quarterly reports of implementation progress which may result in revisions and adjustments to the Implementation Schedule as needed.

## 13. Conclusion

Illegal harvesting of plant products is a serious global problem with detrimental environmental and economic consequences. Young Living's goal is to provide our customers with the highest level of confidence that the products they are purchasing are manufactured from legal and sustainably grown and harvested plants. Please contact the Chief Compliance Officer, Deputy Compliance Officer, or General Counsel with any questions.

9624628_12.docx



YOUNG LIVING
ESSENTIAL OILS

Lacey Act Compliance Program
Risk Assessment & Purchase Order Review Procedures Flowchart



## YOUNG LIVING LACEY ACT COMPLIANCE PROGRAM IMPLEMENTATION SCHEDULE

**Phase 1 (1Q2017)**
- Finalized Lacey Act Compliance Program Procedures *
- Finalized Purchase Order Review Procedures *
- Commenced identification of Lacey Act Due Care Documentation Database Options
- Completed preliminary designation of Priority 1, 2 and 3 plant products for subsequent high-risk, medium-risk, and low-risk product designations
- Completed preliminary prioritization of high-risk, medium-risk, and low-risk suppliers
- Completed training of suppliers of Priority 1 plant products
- Completed placement of master purchase agreement with all suppliers
- Completed Priority 1 plant products identified at the time, and assigned high, medium or low-risk plant product designation
- Commenced the risk assessment matrices for Priority 2 plant products and assigned high, medium or low-risk plant product designation
- Compiled due care documentation for orders issued in 2017 of high and medium-risk plant products with sourcing decision memoranda
- Conducted advanced Lacey Act compliance training of plant product sourcing personnel
- Conducted Lacey Act compliance training of senior management

**Phase 2 (2Q2017)**
- Reviewed status of implementation of Purchase Order Review Procedures
- Commenced implementation of enhanced tracking and monitoring of purchase order approvals and inventory acceptance processes
- Completed training of suppliers of Priority 2 plant products
- Completed additional Priority 1 and 2 plant product risk assessment matrices and assign to high, medium or low-risk

**Phase 3 (3Q2017)**
- Finalize Lacey Act Recordkeeping and Document Retention Policies
- Research Lacey Act Due Care documentation electronic database options
- Complete training of foreign suppliers of low-risk plant products
- Complete placement of purchase agreements with suppliers of imported plant products
- Complete Priority 3 plant product risk assessment matrices and assign to high, medium or low-risk
- Compile due care documentation for any high-risk and medium risk plant products for aging purchase orders that have not been delivered or accepted into inventory
- Compile due care documentation on orders issued in 2017 of low risk plant products

**Phase 4 (4Q2017)**
- Plan and schedule audits of suppliers of any remaining high-risk plant products using third-party auditors or in-house team (if possible based on harvest seasons)
- Complete compilation of high and medium-risk supplier certifications
- Implementation of approved short-form purchase order with terms & conditions with all suppliers
- Develop and implement advanced supplier U.S. importer training
- Conduct additional Lacey Act training of company personnel involved in the trade of plants and plant products

**Phase 5 (1Q2018)**
- Conduct annual review of risk assessment matrices for high-risk plants products
- Plan and schedule audits of suppliers of medium-risk plant products using third-party auditors or in-house team (if possible based on harvest seasons)
- Conduct annual review of status of suppliers' compliance efforts and procedures that supply high and medium-risk plant products
- Conduct advanced Lacey Act compliance refresher training and "lessons learned" training of company personnel involved in the trade of plants and plant products
- Complete compilation of low-risk supplier certifications

**Ongoing Compliance Tasks**
- Evaluation and risk assessments of new plants and plant products
- Evaluation of new suppliers of plants and plant products
- Ongoing due care of existing plant products and suppliers
- Ongoing evaluation of high-risk and medium-risk plants and plant products
- Ongoing updating of Compliance Program Procedures *
- Prepare annual Lacey Act Compliance Program Implementation Schedule
- Quarterly compliance reports to senior management and Board

* Procedures shall be evaluated and updated on an ongoing basis to reflect new information, lessons learned and needs.

9431154_13.docx

September 17, ,2017



Young Living
ESSENTIAL OILS

Lacey Act Compliance Program
Risk Assessment & Purchase Order Review Procedures Flowchart



## YOUNG LIVING LACEY ACT COMPLIANCE PROGRAM IMPLEMENTATION SCHEDULE

### Phase 1 (1Q2017)
- Finalized Lacey Act Compliance Program Procedures *
- Finalized Purchase Order Review Procedures *
- Commenced identification of Lacey Act Due Care Documentation Database Options
- Completed preliminary designation of Priority 1, 2 and 3 plant products for subsequent high-risk, medium-risk, and low-risk product designations
- Completed preliminary prioritization of high-risk, medium-risk, and low-risk suppliers
- Completed training of suppliers of Priority 1 plant products
- Completed placement of master purchase agreement with all suppliers
- Completed Priority 1 plant products identified at the time, and assigned high, medium or low-risk plant product designation
- Commenced the risk assessment matrices for Priority 2 plant products and assigned high, medium or low-risk plant product designation
- Compiled due care documentation for orders issued in 2017 of high and medium-risk plant products with sourcing decision memoranda
- Conducted advanced Lacey Act compliance training of plant product sourcing personnel
- Conducted Lacey Act compliance training of senior management

### Phase 2 (2Q2017)
- Reviewed status of implementation of Purchase Order Review Procedures
- Commenced implementation of enhanced tracking and monitoring of purchase order approvals and inventory acceptance processes
- Completed training of suppliers of Priority 2 plant products
- Completed additional Priority 1 and 2 plant product risk assessment matrices and assign to high, medium or low-risk

### Phase 3 (3Q2017)
- Finalize Lacey Act Recordkeeping and Document Retention Policies
- Research Lacey Act Due Care documentation electronic database options
- Complete training of foreign suppliers of low-risk plant products
- Complete placement of purchase agreements with suppliers of imported plant products
- Complete Priority 3 plant product risk assessment matrices and assign to high, medium or low-risk
- Compile due care documentation for any high-risk and medium risk plant products for aging purchase orders that have not been delivered or accepted into inventory
- Compile due care documentation on orders issued in 2017 of low risk plant products

**Phase 4 (4Q2017)**
- Plan and schedule audits of suppliers of any remaining high-risk plant products using third-party auditors or in-house team (if possible based on harvest seasons)
- Complete compilation of high and medium-risk supplier certifications
- Implementation of approved short-form purchase order with terms & conditions with all suppliers
- Develop and implement advanced supplier U.S. importer training
- Conduct additional Lacey Act training of company personnel involved in the trade of plants and plant products

**Phase 5 (1Q2018)**
- Conduct annual review of risk assessment matrices for high-risk plants products
- Plan and schedule audits of suppliers of medium-risk plant products using third-party auditors or in-house team (if possible based on harvest seasons)
- Conduct annual review of status of suppliers' compliance efforts and procedures that supply high and medium-risk plant products
- Conduct advanced Lacey Act compliance refresher training and "lessons learned" training of company personnel involved in the trade of plants and plant products
- Complete compilation of low-risk supplier certifications

**Ongoing Compliance Tasks**
- Evaluation and risk assessments of new plants and plant products
- Evaluation of new suppliers of plants and plant products
- Ongoing due care of existing plant products and suppliers
- Ongoing evaluation of high-risk and medium-risk plants and plant products
- Ongoing updating of Compliance Program Procedures *
- Prepare annual Lacey Act Compliance Program Implementation Schedule
- Quarterly compliance reports to senior management and Board

* Procedures shall be evaluated and updated on an ongoing basis to reflect new information, lessons learned and needs.

9431154_13.docx

September 17, ,2017